UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Arredondo, | § | |
|     *Plaintiff,* | § | |
| | § | |
| vs. | § | Civil Action H-06-1580 |
| | § | |
| Gulf Bend Center, | § | |
|     *Defendant.* | § | |

## OPINION ON SUMMARY JUDGMENT

*Pro se* plaintiff Robert Arredondo alleges that Gulf Bend Center ("Center") unlawfully retaliated and discriminated against him based on gender and disability in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA"). Before the court[1] is the Center's motion for summary judgment, which was argued on March 12, 2007. (Dkt. 73). For reasons discussed below, defendant's motion will be GRANTED.

## BACKGROUND

Robert Arredondo was hired as a mental retardation counselor by the Center on November 1, 2004. Gulf Bend Center is a governmental entity that provides out-patient and residential care to indigent mental health and mental retardation patients in seven counties. Some patients (whom the Center refers to as "consumers") occasionally exhibit violent, aggressive, or otherwise inapproporiate behavior.

---

[1] The parties have consented to the jurisdiction of this magistrate judge for all purposes, including final judgment. (Dkt. 36).

One such incident occurred on May 3, 2005.[2] A number of patients has been transported by van to get hair cuts. Upon re-boarding the van for the return trip, one patient ("Jeffrey") became angry and agitated when he found his previous seat taken by another patient ("Charles"). Jeffrey began violently shaking the seats and "mildly choking" Charles by pulling at his seatbelt restraint. When the staff tried to intervene, Jeffrey screamed and cursed at them using a familiar racial epithet. He then threatened them by shaking his fist and saying he would give them a "fat lip." He also repeatedly threatened "to cut staff with a knife." At that point Arredondo, who had not witnessed these events, was called to come out and speak with Jeffrey. He asked Jeffrey to step out of the van. Jeffrey complied, but while exiting the van he hit the back of a seat occupied by another patient. Arredondo spoke with Jeffrey for approximately 30 minutes, and then decided to "de-stimulate" him by taking him for an unaccompanied ride around town in his (Arredondo's) personal vehicle. Arredondo did not notify his immediate supervisor, Richard Wright, before leaving the facility with Jeffrey.

Immediately upon learning of Arredondo's unauthorized "ride," Wright called Arredondo on his cell phone and directed him to return to the Center with the patient right away. Upon his return Arredondo was confronted by both Wright and Ernest Moss, the director of clinical services. Arredondo acknowledged that he had removed Jeffrey from the

---

[2] This description of the incident is taken from documents submitted by the plaintiff in response to the summary judgment motion. (Dkt. 74, pp. 30-35.)

facility and taken him for a ride in order to "de-escalate" him. It was undisputed that no other staff member was in the vehicle to assist in case the patient had continued his aggressive and unruly behavior.

Wright immediately contacted the Texas Department of Family and Protective Services ("DFPS") to report what he considered to be an incident of "client endangerment." Pending the DFPS investigation, Arredondo was placed on paid administrative leave for exhibiting "poor clinical judgment" involving a "verbally and physically aggressive" patient, which "not only endangered the safety and well being of this consumer but also that of your own."[3]

The DFPS ultimately determined that it would take no action, and referred the matter back to the Center for further review. Upon learning the DFPS decision, Moss and human resources director Scott Granz recommended to Bill Kelly, the director of administrative services, that Arredondo be terminated for poor clinical judgment. On May 5, 2005, Arredondo was given written notice of this recommendation, which read in part:

> On May 3rd 2005, you were contacted by staff and asked to intervene with a consumer who was in the middle of a crisis. Because the consumer was committing acts of verbal and physical aggression, staff believed it was not safe to transport this consumer and by doing so would only place individuals in harms way. It is documented that staff was not asked for complete details before you took responsibility for this consumer.
>
> . . . After reviewing the situation and the actions you chose to take, it is my belief that your exhibition of poor clinical judgment is neither acceptable nor

---

[3] Defendant's Ex. B-A (Dkt.73-3).

desirable for Gulf Bend MHMR Center employment.

Therefore, per the center's Personnel Policies & Procedures, Chapter 14 (Termination at Will) I am recommending your termination from employment to Mr. Bill Kelly, Director of Administrative Services, to be effective immediately.

First, However, I want to offer you the opportunity to provide any information in writing that you want Mr. Kelly to consider before he makes this decision.

Return this letter and your endorsement to the Human Resources Management (HRM) Department no later than Monday, May 09, 2005. If HRM has not received your reply by that time, it will be assumed that you agree with the recommendation to discharge you from employment with the Center.

D.Ex. B-B (Dkt. 73-3).

Arredondo timely appealed this recommendation to human resources, and asked that further correspondence be directed to his attorney. Granz acknowledged Arredondo's appeal, and advised that Kelly would make a final decision by May 11, 2005 at the latest.[4] The following day, on May 10, 2005, Arredondo's attorney wrote a letter to the Center which referred to Arredondo's "former employment with Gulf Bend Center," and requested the return of Arredondo's personal belongings, as well as information about continuation of his health insurance under COBRA.[5] The Center construed this letter as a voluntary resignation by Arredondo, and so took no further action regarding Arredondo's appeal of the recommended termination.

Shortly thereafter, Arredondo timely filed a charge of discrimination with the Texas

---

[4] D.Ex. B-C (Dkt. 73-3).

[5] D.Ex. E (Dkt. 73-3).

Workforce Commission and the EEOC, alleging that he had been unlawfully discharged because of sex, disability, and retaliation for protected activity.[6] The protected activity referred to was an internal sexual harassment complaint Arredondo filed on April 7, 2005, against a Christie Hernandez, a female co-worker who allegedly asked him out on a date and made sexually derogatory comments. The Center investigated the complaint and ultimately concluded by memo dated April 26, 2005 that sexual harassment had not been proven.

## STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002). The movant need not introduce evidence to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney*

---

[6] D. Ex. F (Dkt. 73-7).

*Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)); *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255; *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 817 (5th Cir. 2002).

## ANALYSIS

**1.      Title VII Gender Discrimination Claim**

Arredondo alleges that he was terminated because of his sex in violation of Title VII. 42 U.S.C. § 2000e-2(a). In considering a Title VII motion for summary judgment, the ultimate question is no different than it would be for any other case governed by Rule 56: whether a reasonable fact-finder could return a verdict for the plaintiff, considering all the evidence in the light most favorable to the plaintiff. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (trial courts should not "treat discrimination differently from other ultimate questions of fact"), *quoting United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983); *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 150 ( 1984) ( finding "no satisfactory basis for giving Title VII actions a special status under the Rules of Civil Procedure"). In a Title VII case, the ultimate determination is whether a reasonable fact-finder could infer discrimination. *See Reeves,* 530

U.S. at 143.  In making this determination, a court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case...." *Id.* at 148-49.

The Center initially argues that Arredondo's claim fails because he resigned, and therefore suffered no "ultimate employment decision." *See Dollis v. Rubin,* 77 F.3d 777, 781-82 (5th Cir. 1995).  However, the Fifth Circuit has often found that an employee may have a cognizable claim when he is forced to resign in order to avoid involuntary discharge. *See Holden v. Knight,* 155 Fed. Appx. 735, 739-40 (5th Cir. 2005).  "Constructive discharge in these cases arose from the employee's finding himself between the Scylla of voluntary resignation and the Charybdis of forced termination." *Fowler v. Carrollton Public Library,* 799 F.2d 976, 981 (5th Cir. 1986).

Here, Arredondo does not admit that he resigned, and there are facts to support his position.  No resignation letter was ever submitted by Arredondo.  Upon receiving notice that his two direct superiors had recommended his termination, Arredondo took steps to appeal it, and his appeal was acknowledged by the human resources manager.  The Center's argument for resignation is based entirely upon a letter from Arredondo's attorney the day before the discharge decision became final, in which reference was made to Arredondo's "former employment."  While it is possible that the Center reasonably interpreted this letter as a statement of resignation, it is equally plausible that the Center merely seized upon the

letter as a way of insulating itself from the consequences of a formal discharge.[7] Even if the letter had plainly stated Arredondo's intent to resign, which it did not, resignation might easily have been seen by Arredondo as a way to put the best face on a termination which seemed inevitable. At the very least, there are genuine issues of material fact regarding Arredondo's alleged resignation, which must be resolved in his favor at this stage.

That said, there is nothing in this record which gives the slightest hint that Arredondo's gender played any part in his termination. All Center officials involved in his discharge were male. Arredondo points to no evidence that other similarly situated female employees were treated more favorably, nor is there any basis to infer that his discharge was the product of sexual stereotyping or sexist bias.[8]

Furthermore, the Center has presented a legitimate non-discriminatory reason for its actions: Arredondo's poor clinical judgment in taking a patient who had just exhibited verbally and physically aggressive behavior for an unauthorized and unaccompanied ride in his personal vehicle.[9] Arredondo cannot dispute the underlying facts of the incident, which are firmly established by evidence attached to his own response to the summary judgment motion. Arredondo maintains that the Center overreacted to the incident by imposing the most severe employment sanction possible – discharge. But that argument misses the mark.

---

[7] For example, the Center was able to avoid liability for unemployment compensation by this tactic. D.Ex. D (Dkt. 73-5).

[8] Arredondo Dep. at 44-45.

[9] *Id.* at 51-52.

Courts do not sit as "super personnel" agencies to second-guess the employer's judgment about the appropriate sanction for a particular form of misconduct. *See Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988). The employer is in the best position to calibrate the level of discipline to the seriousness of the offense. Absent any reason to believe that decision was infected by an unlawful factor, a court has no warrant to intervene.

There is no proof on this record that the Center's articulated reason was a pretext for discrimination. Thus, Arredondo is left with only his unsubstantiated subjective belief about his employer's alleged animus, which is insufficient to take the case to a jury. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). Because Arredondo has not offered sufficient evidence to create a genuine issue of material fact, his gender discrimination claim must be dismissed.

## 2.     Retaliation Claim

Arredondo alleges that the Center retaliated against him because of his sexual harassment complaint, which had been resolved a few days prior to his discharge. The anti-retaliation provision of Title VII forbids discrimination against an employee or job applicant who has "made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." 42 U.S.C. § 2000e-3(a). To prevail on a retaliation claim, the plaintiff must establish that (1) he participated in statutorily protected activity, (2) he received an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Armstrong v. City of Dallas*, 997 F.2d 62, 65 n. 3 (5th Cir. 1993). A "but

for" causation standard is applicable to retaliation cases in the Fifth Circuit. *Strong v. University Health Care System, L.L.C.,* ___ F.3d ___, 2007 WL 891148 (5th Cir., March 26, 2007); *Jack v. Texaco Research Center,* 743 F.2d 1129, 1131 (5th Cir. 1984). Under that standard, the plaintiff is required to "put forth legally sufficient summary judgment evidence that [he] would not have been fired but for [his] complaint against [his employer]." *Strong,* slip op. at 8.

The Center concedes that Arredondo's harassment complaint was protected activity, and the court assumes for reasons already explained that Arredondo suffered an adverse employment action. Nevertheless, Arredondo's retaliation claim fails because he has presented no evidence sufficient to warrant an inference that he would not have been terminated but for his harassment complaint.

Nothing on this record remotely suggests a retaliatory motive. The Center displayed absolutely no hostility to Arredondo's harassment charge. The alleged harasser was a co-employee rather than a supervisor or manager, and she resigned her position before the investigation was finished. Although the investigation concluded that sexual harassment had not been proven, Arredondo acknowledged via e-mail dated May 2, 2005 that the Center had "acted in good faith in this matter, " and pronounced himself "satisfied" with the result.[10] Arredondo makes no claim that the Center had retaliated against any other employees for submitting discrimination complaints. Nor is there any evidence to suggest that the

---

[10] Dkt. 74-2, at p. 6.

articulated reason for his discharge (i.e. poor clinical judgment in handling a verbally abusive and physically aggressive patient) was a pretext for a retaliatory motive.

Arredondo's only evidence of causal nexus is the temporal proximity between the harassment complaint he filed on April 7, 2005 and his termination one month later. Arredondo finds it suspicious that he was suspended one day after the investigation into his harassment complaint was closed.[11] But while temporal proximity may be one element in determining causal connection, the Fifth Circuit has made it very clear that "temporal proximity standing alone is insufficient to prove but for causation." *Strong,* slip op. at 13. Judge DeMoss's opinion takes great pains to stress this point:

> To prevent future litigants from relying on temporal proximity alone to establish but for causation, we once again attempt to clarify the issue. . . *Breeden* makes clear that (1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close in some instances establish a prima facie case of retaliation. *See id.* But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation. Such a rule would unnecessarily tie the hands of employers.

*Id.* (emphasis added).

The timing of Arredondo's discharge illustrates Judge DeMoss's point. The mere fact that Arredondo had previously filed a harassment complaint does not render him immune from the same sorts of discipline and punishment to which other employees are subject. Arredondo has provided the court with no basis to believe that other employees acting as he

---

[11] The letter from the human resources director concluding the investigation was actually dated April 26, 2005, although it was apparently presented to Arredondo and signed by both parties on May 2, 2005. Dkt. 74-2, pp. 4-5.

did would have been treated with more leniency. The mere fact that he filed a harassment complaint does not confer a privileged status upon him, nor tie the Center's hands in responding to conduct which it reasonably viewed as endangering a patient, an employee, and the general public.

Accordingly, Arredondo's retaliation claim does not survive summary judgment.

**3.     Disability Claim**

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to bring an ADA discrimination claim, a plaintiff must show that he is a "qualified individual with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). The ADA defines disability to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(2).

As a general matter, determination of disability status is to be based upon an individualized assessment of the plaintiff's condition, rather than a *per se* approach. *See Deas v. River West, L.P.,* 152 F.3d 471, 478 (5th Cir. 1998) ("We have consistently

emphasized that an individualized, case-by-case determination of disability best achieves the purposes of the ADA"); *see also Bragdon v. Abbott,* 524 U.S. 624, 639-42 (1998) (specifically declining to rule whether HIV infection is a *per se* disability, instead conducting an individualized inquiry into its impact on plaintiff's major life activities).

This rejection of a *per se* approach to disability status makes it essential for an ADA plaintiff to develop a detailed factual record concerning the substantial limitations on his major life activities. Seemingly reasonable assumptions and generalizations will not suffice. *See e.g., Deas,* 152 F.3d at 479 (declining to recognize epilepsy as a disability *per se*); *Still v. Freeport-McMoran, Inc.,* 120 F.3d 50, 52 (5th Cir. 1997) (blindness in one eye not necessarily a disability); *Bridges v. City of Bossier,* 92 F.3d 329, 336 n. 11 (5th Cir. 1996) (hemophilia is not disability *per se*); *Burch v. Coca-Cola Co.,* 119 F.3d 305, 316 (5th Cir. 1997) ( alcoholism not a *per se* disability); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir. 1996) (asbestos victim with 50% lung capacity not disabled); *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 805-06 (5th Cir. 1997) (employee with surgically implanted heart pacemaker not disabled). While the results in some of these cases may seem restrictive, they are the natural by-product of a statute designed to counteract stereotypical assumptions regarding persons who have physical or mental impairments. Just as employers are required to look beyond the label or diagnosis of a particular impairment, so must the employee who brings an ADA suit.

Arredondo alleges that he is disabled because he suffers from bipolar disorder, and

is dysgraphic and dyslexic. As demonstrated above, however, merely having an impairment does not make one disabled. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002). Instead of showing how major life activities were substantially limited by his impairments, Arredondo points to evidence which merely affirms the existence of those impairments: he received mental health care for 30 years, was a recipient of special education services, became a client of the Center in 1987, and has been hospitalized repeatedly throughout his life. Arredondo also states that he received special accommodations including modified testing in graduate school. This evidence is literally beside the point. Proving disability requires offering evidence that the extent of the limitation caused by the impairment is substantial in terms of the plaintiff's own experience. *Toyota,* 534 U.S. at 691. Furthermore, a person whose physical or mental impairment is corrected by mitigating measures may still be impaired, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.[12] *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). Arredondo's evidence fails to show how his impairments substantially limit any major life activity, and therefore he is not disabled under any part of the three-pronged ADA definition of disability.[13]

---

[12] The EEOC describes major life activities as functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i).

[13] Arredondo does not contend that he was erroneously "regarded as" having a disability which he did not actually have. *Cf. Rodriguez v. ConAgra Grocery Products Co.,* 436 F.3d 468 (5th Cir. 2006).

Finally, even if Arredondo could prove that he was disabled with the meaning of the ADA, as explained above, there is no evidence that the Center's reasons for its actions were pretextual. Therefore, Arredondo's ADA claim must be dismissed.

## **CONCLUSION**

For the reasons discussed above, it is ordered that Gulf Bend Center's motion for summary judgment be granted in its entirety. Judgment will be entered dismissing all claims by Arredondo against Gulf Bend Center.

Signed at Houston, Texas on March 30, 2007.

Stephen Wm Smith
United States Magistrate Judge